*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* MCMICHAEL, Minors.

UNPUBLISHED
July 13, 2026
12:37 PM

No.  376238
Oakland Circuit Court
Family Division
LC No.  2025-887976-NA

Before:  RICK, P.J., and MURRAY and BORRELLO, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order concluding that active efforts were made to prevent the breakup of the Indian family as required by the Indian Child Welfare Act (ICWA), 25 USC 1901 *et seq*., and Michigan's Indian Family Preservation Act (MIFPA), MCL 712B.1 *et seq*., and authorizing the petition regarding her children, LLM, JLM, and JALM. Finding no errors requiring reversal, we affirm.

## I.  BACKGROUND FACTS AND PROCEDURAL HISTORY

In December 2024, the Oakland County Sheriff's Office executed a search warrant on the family home where respondent lived with her husband, JLMJ,[1] and their three young children. Detectives recovered a large quantity of drugs, weapons, and ammunition, which were unsecured and within reach of the children.

Kira Binkowski, a Children's Protective Services (CPS) specialist with the Department of Health and Human Services (DHHS), began an investigation shortly after the raid, and discovered that the children were already placed with their maternal grandmother, Brandie O'Berry. During Binkowski's first interview with respondent in December 2024, respondent claimed Native

---

[1] JLMJ is also a respondent in the lower court proceedings, but he is not a party to this appeal.

American heritage. Respondent and JLMJ agreed to a temporary voluntary arrangement (TVA) in which they would keep their children in the care of O'Berry.

DHHS presented its initial petition, which sought a temporary wardship over the children, in January 2025. The first preliminary hearing was held the next day. At the hearing, both parents claimed tribal affiliation, and the referee directed DHHS to send the appropriate ICWA notices to the tribes identified by respondent and JLMJ. The referee stated that he was placing the children with DHHS for care and planning, but the children would not be removed from O'Berry's home. The hearing was then adjourned until March 2025.

When the next hearing was held in March, the referee noted that the children's biographical information was incorrect on the ICWA notices sent to the applicable tribes. The referee adjourned the hearing so that DHHS could comply with the ICWA and MIFPA notice requirements.

At the preliminary hearing in May, respondent withdrew her consent to the voluntary placement with O'Berry. The referee reviewed the ICWA notices and the green return receipt cards indicating that the notices were delivered to the relevant tribes. The referee determined that DHHS had complied with the notice requirements of both ICWA and MIFPA. By that time, the children were members of the Sault Ste. Marie tribe of Chippewa Indians, and so DHHS requested an adjournment because the tribe intended to intervene in the case. Respondent's counsel requested that the children be returned home because there were no active efforts made to prevent the breakup of the family before the children were removed. The referee did not return the children to respondent's care and instead adjourned the hearing so that a tribal representative could participate.

The preliminary hearing resumed in June 2025. Counsel and a caseworker for the Sault Ste. Marie tribe were present. Binkowski testified about DHHS's active efforts to prevent the breakup of the family, and opined that there were not any services or efforts that could have been made that would have allowed the children to be safely placed with respondent.

Next, respondent's counsel called Heidi Nesberg, a caseworker with the Sault Ste. Marie tribe, as a witness. Nesberg was qualified as an expert regarding ICWA and MIFPA's active-efforts requirement. She opined that respondent and JLMJ were offered services that the tribe would consider appropriate to prevent the children's removal. Further, it was the tribe's position that if the children had been returned to their parents, the children would have been in physical and psychological danger.

At the conclusion of the hearing, the referee held that, by a clear and convincing standard, DHHS did make active efforts to prevent the breakup of the Indian family, but those efforts were unsuccessful. The referee further found that even if DHHS did not comply with ICWA and MIFPA, the children were at substantial risk of harm so continued custody was warranted under MCL 712B.19. After respondent waived the probable cause determination, the court authorized the petition and recognized the tribe as an intervening party. This appeal followed as of right.

## II. STANDARDS OF REVIEW

We review "de novo the interpretation and application of statutes and court rules." *In re Ott*, 344 Mich App 723, 735; 2 NW3d 120 (2022). This includes the interpretation and application

of ICWA and MIFPA. *In re McCarrick/Lamoreaux*, 307 Mich App 436, 462-463; 861 NW2d 303 (2014). Additionally, we review "for clear error the trial court's findings of fact underlying the legal issues." *Id*. at 463. A finding is clearly erroneous if we are "definitely and firmly convinced that the trial court made a mistake." *Id*.

## III. ICWA AND MIFPA NOTICE

Respondent first argues that the trial court committed a reversible error by proceeding on a petition for removal that involved children who were members of a tribe when DHHS failed to comply with the notice provisions of ICWA and MIFPA.

## A. STATUTORY NOTICE REQUIREMENTS

Congress enacted ICWA in 1978 to protect and preserve Indian families in response to growing concerns over "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *In re Morris*, 491 Mich 81, 97-98; 815 NW2d 62 (2012) (quotation marks and citation omitted). Consequently, when a state court adjudicates a custody proceeding involving an Indian child, which is broadly defined to include foster-care placements, adoptions, and terminations of parental rights, "ICWA governs from start to finish." *Haaland v Brackeen*, 599 US 255, 266; 143 S Ct 1609; 216 L Ed 2d 254 (2023). See also 25 USC 1903(1).

If the child qualifies as an Indian child under ICWA, certain additional notice requirements are applicable:

> In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary [of the Interior] in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: *Provided*, That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding. [25 USC 1912(a).]

The Supreme Court, in *Morris*, summarized these notice requirements as follows:

> First, 25 USC 1912(a) applies only to *involuntary* foster care placements and *involuntary* termination of parental rights proceedings occurring in state courts. Second, if the "knows or has reason to know" notice condition is triggered, the party seeking foster care placement or termination of parental rights has a duty to send notice of the proceedings to (1) the parent or Indian custodian and (2) the Indian child's tribe. Third, the notice must be sent by registered mail with return

receipt requested. Fourth, the contents of the notice must advise, at minimum, of both the pending proceedings and the right of the party receiving the notice to intervene. Fifth, if the party seeking termination cannot ascertain the identity of either (1) the parent or Indian custodian of the child or (2) the Indian child's tribe, then notice must be sent to the "Secretary," meaning the Secretary of the Interior. Sixth, once the party seeking foster care placement or termination of parental rights receives the return receipt showing that delivery of notice has been made, a clock begins to run from the date of delivery shown on the return receipt. The tribe, parent, or Indian custodian has 10 days beginning on the date of receipt to respond to the notice, but may request up to an additional 20 days. Seventh, the trial court may hold no foster care placement or termination of parental rights proceedings until after the stated time periods have elapsed. Thus, if the notice condition is triggered, the requisite notice must be sent and—other than necessary temporary orders pending resolution of the ICWA matter—the trial court may not hold any proceedings regarding either foster care placement or termination of parental rights until after passage of the requisite waiting periods: 10 days, or up to an additional 20 days if requested. [*Morris*, 491 Mich at 102-104.]

The Court also clarified that if the notice condition is triggered, the children need not be automatically returned home. *Id*. at 103 n 15. "[U]ntil the ICWA-notice issue is resolved, the trial court need not change, and may order, temporary placements of the children because the mere triggering of 25 USC 1912(a) notice does not divest the court of jurisdiction." *Id*.

As the *Morris* Court made clear, ICWA's notice provisions apply to involuntary proceedings. An involuntary proceeding includes any child-custody proceeding in which the parent "does not consent of his or her free will to the foster-care, preadoptive, or adoptive placement or termination of parental rights or in which the parent consents to the foster-care, preadoptive, or adoptive placement under threat of removal of the child by a State court or agency." 25 CFR 23.2. When the parent voluntarily places the child in foster care, a different subsection of ICWA applies. See 25 USC 1913(a).

At the state level, the Legislature adopted MIFPA to "establish state law standards for child welfare and adoption proceedings involving Indian children." *In re Williams*, 501 Mich 289, 298; 915 NW2d 328 (2018). Although MIFPA echoes many of the substantive and procedural requirements of ICWA, some of its standards "provide greater protections for Indian families than those provided by ICWA." *Id*. Some of MIFPA's procedural and substantive requirements include:

(1) the state must give notice of the pending proceeding to the Indian tribe; (2) before removal or to continue removal, the state must prove by clear and convincing evidence that active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, that the active efforts were unsuccessful, and that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child; (3) when seeking termination, the state must demonstrate that active efforts were made to prevent the breakup of the Indian family and that the efforts were unsuccessful; and (4) any termination of parental rights must be

supported by evidence beyond a reasonable doubt and by the testimony of at least one qualified expert who knows about the child-rearing practices of the Indian child's tribe. [*Id*. at 301-302.]

However, MIFPA's notice requirements differ from the notice requirements under ICWA. Specifically, under MIFPA, notice must be given to the child's tribe in any child custody proceeding, irrespective of whether the proceeding is voluntary or involuntary. MCL 712B.9(1). Indeed, the provision in MIFPA that permits a parent to voluntarily relinquish his or her parental rights to the child requires that notice be given to the tribe. MCL 712B.13(1)(b). "No foster care placement or termination of parental rights proceeding shall be held until at least 10 days after receipt of notice by the parent or Indian custodian and the tribe or the secretary." MCL 712B.9(2).

Both ICWA and MIFPA contain a safe harbor provision wherein the court must decline jurisdiction over a petition and return the child to his or her parents after an improper removal "unless returning the child to his parent or custodian would subject the child to a substantial and immediate danger or threat of such danger." 25 USC 1920; see also MCL 712B.19.

## B. RESPONDENT FAILS TO DEMONSTRATE NOTICE ERROR

As an initial matter, respondent argues that "the record is clear that notice was not provided to the relevant tribes as required by ICWA and MIFPA." In doing so, respondent does not make clear what specific violations of ICWA and MIFPA she is alleging, nor does she clarify how the notice provided was deficient. It appears that respondent's complaint is primarily about the timing of the notice provided because she argues that the ICWA and MIFPA requirements were triggered when respondent made her initial disclosure of Indian heritage in an interview with Binkowski in December 2024, and yet DHHS filed the initial petition on January 9, 2025, and the court conducted a preliminary hearing on January 10, 2025, before notifying the relevant tribes.

But as *Morris* makes clear, the ICWA-notice requirements apply only to *involuntary* foster-care placements. *Morris*, 491 Mich at 102-103. Before CPS was involved with the family, respondent voluntarily placed the children with O'Berry, and this voluntary placement continued until respondent revoked her consent to the voluntary arrangement under 25 USC 1913 at the preliminary hearing in May 2025. Consequently, because the placement was voluntary before May 2025, ICWA's notice requirement was not yet implicated. *Morris*, 491 Mich at 102-103. See also 25 USC 1912(a).

Once respondent revoked her consent to the temporary voluntary arrangement at the May 2025 hearing, the children's placement with O'Berry was no longer voluntary, and the ICWA notice requirements were triggered. By that point, however, DHHS had already sent the required notices to the relevant tribes and the court had received the green return receipt cards more than 10 days before the hearing. DHHS was already in contact with representatives from the Sault Ste. Marie tribe about the case, and Nesberg had attended a family team meeting. Consequently, because DHHS provided notice to the potential tribes by the time the foster-care placement became involuntary, respondent has not demonstrated that the court erred when it determined that DHHS complied with ICWA's notice requirements. *Morris*, 491 Mich at 102-103.

As noted, the distinction between voluntary and involuntary proceedings is not present in the text of MIFPA; rather, MCL 712B.9(1) simply requires that notice be given to the Indian child's tribe in *any child custody proceeding*. Notice must be provided to the tribe at least 10 days before a proceeding involving a foster care placement or termination of parental rights. MCL 712B.9(2). Under the definitions provided in MIFPA, a foster care placement is defined as follows:

> (*i*) Foster care placement. Any action *removing* an Indian child from his or her parent or Indian custodian, and where the parent or Indian custodian cannot have the Indian child returned upon demand but parental rights have not been terminated, for temporary placement in, and not limited to, 1 or more of the following:

> (A) Foster home or institution.

> (B) The home of a guardian or limited guardian under part 2 of article V of the estates and protected individuals code, 1998 PA 386, MCL 700.5201 to 700.5219.

> (C) A juvenile guardianship under chapter XIIA. [MCL 712B.3(b)(*i*) (emphasis added).]

Therefore, under MCL 712B.9(2), the court was not permitted to hold a proceeding regarding a foster care placement, i.e., the removal of the children from respondent's care, until 10 days after receiving the green return receipt card from the tribes. MCL 712B.9(2); MCL 712B.3(b)(*i*). Removal in this context requires "the physical transfer or movement of a child," *In re Detmer/Beaudry*, 321 Mich App 49, 63; 910 NW2d 318 (2017), which means "the instance when a court orders that a child be physically transferred or moved from the care and residence of a parent or custodian to the care and residence of some other person or institution," *id*. at 64. When the parent voluntarily places the child with a custodian and neither the court nor the parties understand "the voluntary placement to be a permanent relinquishment of any of [the respondent's] parental rights," and when there was nothing to suggest that the respondent would be precluded from revoking the consent and requiring more formal proceedings, the child has not been "removed" under the statutory definitions. *Id*. at 65-66. Rather, "this is an example of [a parent] exercising her fundamental right to make decisions concerning the care, custody and control of her children." *Id*. at 66 (quotation marks and citation omitted).

Here, the court conducted a hearing in January 2025, which was before DHHS sent the notices required by MIFPA to the potential tribes involved. At that point, respondent had voluntarily placed the children in O'Berry's care and agreed to a TVA. At the hearing, the court ordered that the children be placed with DHHS for care and supervision but did not change their living arrangement with O'Berry. Because the court did not order that the children be moved or physically transferred from the custodian designated by respondent, it did not remove the children at the hearing, *Detmer/Beaudry*, 321 Mich App at 63, and the MIFPA's notice provisions were not triggered under MCL 712B.3(b). When respondent revoked her consent and demanded that the children be returned to her care at the May 2025 hearing, the placement became involuntary, and the children's continued presence in O'Berry's home against respondent's wishes was no longer a

-6-

reflection of respondent's fundamental right to direct the care of her children. *Detmer/Beaudry*, 321 Mich App at 65-66. But by then DHHS had provided notice to the tribes, and the court had received the green receipt confirmation cards. Accordingly, by the time the children were removed from her care under the definition in *Detmer/Beaudry*, the MIFPA-notice requirements were satisfied.

Even if the court erred when it proceeded with some portion of the preliminary hearing before DHHS provided the notice required by ICWA and MIFPA, respondent would not be entitled to relief. MCL 712B.19 provides the following safe-harbor provision:

> If a court determines at a hearing that a petitioner in an Indian child custody proceeding has improperly removed the child from custody of the parent or Indian custodian or has improperly retained custody after a visit or other temporary relinquishment of custody, the court shall decline jurisdiction over the petition and immediately return the child to his or her parent or Indian custodian unless returning the child to his or her parent or Indian custodian would subject the child to a substantial and immediate danger or threat of danger.

The trial court found that this provision applied because of the substantial risk of harm to the children from the drugs and weapons that were found in the home within reach of the children. Respondent does not address this provision on appeal or include any argument as to why the trial court's conclusion that the provision was satisfied was erroneous. Consequently, even if respondent was correct that ICWA and MIFPA's notice provisions were not satisfied, she has not demonstrated that she is entitled to relief because she has not demonstrated that the trial court's conclusion that MCL 712B.19 applied was erroneous.

## IV. TIMING AND SUFFICIENCY OF ACTIVE-EFFORTS DETERMINATION

Next, respondent argues that the trial court erred when it removed the children from her care without first finding that DHHS made active efforts to prevent the breakup of her family as required by ICWA and MIFPA, and that the court's conclusion at the final preliminary hearing that DHHS made active efforts was unsupported by the record.

### A. OVERVIEW OF ACTIVE EFFORTS REQUIREMENT

Under ICWA, the provision addressing involuntary proceedings includes the following requirement:

> Any party seeking to effect a foster care placement of . . . an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. [25 USC 1912(d).]

A foster care placement is defined as any action "removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated." 25 USC 1903(1)(i).

Under ICWA, active efforts "means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family." 25 CFR 23.2. Further, "[a]ctive efforts are to be tailored to the facts and circumstances of the case[.]" *Id*.

MIFPA contains a similar active-efforts requirement:

> (2) An Indian child may be removed from a parent or Indian custodian, placed into a foster care placement, or, for an Indian child already taken into protective custody, remain removed from a parent or Indian custodian pending further proceedings, only upon clear and convincing evidence that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, that the active efforts were unsuccessful, and that the continued custody of the Indian child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the Indian child. The active efforts must take into account the prevailing social and cultural conditions and way of life of the Indian child's tribe. The evidence must include the testimony of at least 1 qualified expert witness, who has knowledge of the child rearing practices of the Indian child's tribe, that the continued custody of the Indian child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the Indian child. [MCL 712B.15(2); see also MCR 3.967(D).]

When a state court has reason to know that a child is an Indian child but there is insufficient evidence to conclusively determine whether the child is or is not an Indian child, the court must "[t]reat the child as an Indian child, unless and until it is determined on the record that the child does not meet the definition of an 'Indian child' . . . ." 25 CFR 23.107(b).

Additionally, "the requirements of MCL 712B.15(2) that active efforts and a risk-of-harm assessment be made are triggered only when a Native American child is 'removed' from a parent, placed in foster care, or otherwise put in protective custody." *Detmer/Beaudry*, 321 Mich App at 62. As discussed above, removal in this context requires "the physical transfer or movement of a child." *Id*. at 63. When the parent voluntarily places the child with a custodian, the child is not "removed" under the statutory definitions, but rather "this is an example of [a parent] exercising her fundamental right to make decisions concerning the care, custody and control of her children." *Id*. at 66 (quotation marks and citation omitted). Consequently, MIFPA's active-efforts requirement does not apply:

> Although the Legislature has extended some provisions of MIFPA to certain proceedings in which a Native American parent voluntarily gives up her fundamental rights, see, e.g., MCL 712B.13 (requiring that certain requirements be met when a parent consents to a guardianship or voluntarily relinquishes his or her parental rights), our Legislature has not provided these protections when a Native American parent retains in toto her fundamental right to direct the child's care. And, suffice it to say that it is outside our constitutional authority to extend MIFPA on our own. [*Id*.]

When required, the evidence of these active efforts must be clear and convincing. MCL 712B.15(2). The court must also find that the "continued custody of the Indian child by the parent

or Indian custodian is likely to result in serious emotional or physical damage to the Indian child." *Id*.

Active efforts must be tailored to the specific facts and circumstances of the case. 25 CFR 23.2. Active efforts include:

(a) Engaging the Indian child, child's parents, tribe, extended family members, and individual Indian caregivers through the utilization of culturally appropriate services and in collaboration with the parent or child's Indian tribes and Indian social services agencies.

(b) Identifying appropriate services and helping the parents to overcome barriers to compliance with those services.

(c) Conducting or causing to be conducted a diligent search for extended family members for placement.

(d) Requesting representatives designated by the Indian child's tribe with substantial knowledge of the prevailing social and cultural standards and child rearing practice within the tribal community to evaluate the circumstances of the Indian child's family and to assist in developing a case plan that uses the resources of the Indian tribe and Indian community, including traditional and customary support, actions, and services, to address those circumstances.

(e) Completing a comprehensive assessment of the situation of the Indian child's family, including a determination of the likelihood of protecting the Indian child's health, safety, and welfare effectively in the Indian child's home.

(f) Identifying, notifying, and inviting representatives of the Indian child's tribe to participate in all aspects of the Indian child custody proceeding at the earliest possible point in the proceeding and actively soliciting the tribe's advice throughout the proceeding.

(g) Notifying and consulting with extended family members of the Indian child, including extended family members who were identified by the Indian child's tribe or parents, to identify and to provide family structure and support for the Indian child, to assure cultural connections, and to serve as placement resources for the Indian child.

(h) Making arrangements to provide natural and family interaction in the most natural setting that can ensure the Indian child's safety, as appropriate to the goals of the Indian child's permanency plan, including, when requested by the tribe, arrangements for transportation and other assistance to enable family members to participate in that interaction.

(i) Offering and employing all available family preservation strategies and requesting the involvement of the Indian child's tribe to identify those strategies

and to ensure that those strategies are culturally appropriate to the Indian child's tribe.

(j) Identifying community resources offering housing, financial, and transportation assistance and in-home support services, in-home intensive treatment services, community support services, and specialized services for members of the Indian child's family with special needs, and providing information about those resources to the Indian child's family, and actively assisting the Indian child's family or offering active assistance in accessing those resources.

(k) Monitoring client progress and client participation in services.

(*l*) Providing a consideration of alternative ways of addressing the needs of the Indian child's family, if services do not exist or if existing services are not available to the family. [MCR 3.002(1).]

Active efforts require more than creating a service plan and then leaving the parent to his or her own devices to comply with the plan. See MCR 3.002(1) ("Active efforts require more than a referral to a service without actively engaging the Indian child and family."). Rather, the active-efforts standard requires a caseworker to guide the client through the steps of the plan and help the client develop the skills necessary to retain custody of his or her child. *In re JL*, 483 Mich 300, 321; 770 NW2d 853 (2009).

### B. RESPONDENT FAILS TO SHOW ERROR IN TIMING OF ACTIVE EFFORTS

Respondent argues that the trial court erred when it removed her children from her care at the January 2025 preliminary hearing without first ensuring that DHHS made active efforts to prevent the breakup of the Indian family, but her arguments about the timing of the active-efforts requirement are unpersuasive. Before this case was initiated, respondent voluntarily arranged for the children to temporarily live with O'Berry, a decision consistent with respondent's fundamental right to direct the care, custody, and control of her children. *Detmer/Beaudry*, 321 Mich App at 65-66. At the January and March 2025 preliminary hearings, the court did not disturb respondent's voluntary agreement with O'Berry. "There is nothing in the record to suggest that either the court or the parties understood the voluntary placement to be a permanent relinquishment of any of respondent-mother's parental rights . . . ." *Id*. at 65. Accordingly, the children were not removed from respondent's care and active efforts were not required under MIFPA, nor were the active-efforts requirement for involuntary proceedings in ICWA implicated. *Id*. at 65-66. See also 25 USC 1912.

The situation changed when respondent revoked her consent to the voluntary placement at the May 12, 2025 hearing under 25 USC 1913. At that point, the children's continued presence in O'Berry's home was no longer a reflection of respondent's fundamental right to direct the care of her children and constituted a removal of the children from her custody and care. *Detmer/Beaudry*, 321 Mich App at 65-66. Consequently, under both MIFPA and ICWA, DHHS was required to demonstrate that it made active efforts to prevent the breakup of the Indian family to keep the children in O'Berry's home. MCL 712B.15(2). See also 25 USC 1912(d).

-10-

At the hearing on May 12, 2025, the court stated its intention to address whether DHHS had demonstrated active efforts. At that point, neither Nesberg nor anyone from the tribe was available to participate in the hearing, and the court found good cause to adjourn the preliminary hearing because Nesberg would be providing expert testimony regarding the sufficiency of DHHS's active efforts. This is consistent with MIFPA's requirement that an expert who has knowledge of the child-rearing practices of the child's tribe testify. MCL 712B.15(2). The failure to hear the testimony of a qualified expert would have constituted error requiring reversal. *Detmer/Beaudry*, 321 Mich App at 65.

Under MCR 3.967(A), ordinarily a removal hearing must be completed within 14 days of the date an Indian child is taken into protective custody. The court may, however, adjourn the hearing (1) for good cause, (2) after taking into consideration the best interests of the child, and (3) for as short a period as necessary. MCR 3.967(A); MCR 3.923(G). However, preliminary hearings may only be adjourned for up to 14 days to secure the attendance of a witness. MCR 3.965(B)(11). Here, the preliminary hearing was adjourned for nearly a month to secure the presence of a tribal representative, a longer period than the 14 days allowed in MCR 3.965(B)(11). However, as noted above, the court determined that even if the removal was improper, under MCL 712B.19, the children should not have been returned to respondent's care because of the substantial risk of harm to the children from the "exorbitant amount of drugs in the home, weapons in the home, loaded weapons, where these children were present, scales in the home, located throughout the home within the reach of the children." Again, respondent has not challenged the court's conclusion in this regard. Consequently, although respondent may be correct that MIFPA, ICWA, and the court rules did not permit the court to adjourn the May 12, 2025 preliminary hearing for nearly a month without taking testimony regarding active efforts, she has not demonstrated that she is entitled to relief because she does not challenge the court's conclusion under MCL 712B.19 that continued custody was appropriate because of the substantial and immediate danger to the children if returned to her care.

## C. RESPONDENT FAILS TO SHOW ERROR IN SUFFICIENCY OF ACTIVE EFFORTS

In addition to respondent's arguments regarding the timing of DHHS's active efforts, she also challenges the sufficiency of DHHS's active efforts.

At the June 2025 hearing, Binkowski testified that she made active efforts to prevent the breakup of respondent's family, including: (1) conducting a search for extended family members for placement, (2) consulting with a tribal representative with knowledge of the tribe's social and cultural norms, (3) completing an assessment of the family, which included researching their family heritage, (4) reaching out to family members living as far away as Florida, (5) making arrangements for family interactions in the most natural setting, and (6) interviewing respondent to determine what services would be beneficial. Because respondent initially denied involvement with the drugs and weapons in the home, Binkowski concluded that respondent was not in need of any services. Binkowski testified that the active efforts made by DHHS were unsuccessful because respondent was later discovered to be lying about her involvement with the drugs and weapons, and a warrant was issued for respondent's arrest.

Additionally, Nesberg testified as an expert in the active efforts required by ICWA and as a member of the Sault Ste. Marie tribe. Nesberg had attended a family team meeting and spoken

with the caseworkers about the case. She opined that DHHS made active efforts to prevent the breakup of the family, but the efforts were not successful. Respondent represented to DHHS when the case was initially being investigated that she was not involved in the criminal activity occurring within the house, which was later determined to be untrue. The court found that both Binkowski and Nesberg were credible, and, the court gave Nesberg's testimony great weight because she was both qualified as an expert and a member of the tribe.

On appeal, respondent argues that she was not referred to any culturally appropriate services such as Indian parenting class or culturally appropriate therapy, and moreover, she was not referred to any services whatsoever. This is not accurate. In the initial case service plan, the social worker assigned to the case wrote that respondent had been provided information regarding parenting classes in January 2025 even though respondent had not yet been ordered by the court to participate in any services. Although it was not addressed at the preliminary hearing, respondent completed a parenting class offered by CARE of Southeast Michigan before the preliminary hearing in June 2025. Nesberg opined that the services to which respondent had been referred were appropriate and that the tribe did not require Indian parenting classes.

In the end, the testimony presented at the preliminary hearing indicated that DHHS completed the active efforts required by both ICWA and MIFPA. Respondent's only substantive argument regarding the sufficiency of the active-efforts evidence, other than the timing arguments addressed above, was that she was not referred to culturally appropriate services such as Indian parenting classes. But as noted, the record indicates that respondent was referred to parenting classes in January 2025, and that the tribe viewed this referral as appropriate. Respondent has not demonstrated that she is entitled to relief.[2]

Affirmed.

/s/ Michelle M. Rick
/s/ Christopher M. Murray
/s/ Stephen L. Borrello

---

[2] Respondent makes cursory references to several other arguments regarding her due process rights, DHHS's failure to file an initial case service plan within 30 days of removal, and the trial court's failure to ensure the safety of the children's placement after removal. Respondent does not, however, explain or substantiate the claimed errors, nor does she provide any citation to legal authority supporting her contention that appellate relief is warranted. "A party cannot simply assert an error or announce a position and then leave it to this Court to discover and rationalize the basis for her claims, or unravel and elaborate for her her argument, and then search for authority either to sustain or reject her position." Where a party provides no support for his or her position, the Court may consider the issue abandoned. *In re Hudson*, 294 Mich App 261, 265; 817 NW2d 115 (2011). Accordingly, because respondent fails to explain or support these arguments, they are abandoned and we will not address them.